No. 2511.

## Berry Thompson v. The State.

1. **Theft—Evidence—Brands.**—The record of a brand is not admissible as evidence of ownership, in a trial for cattle theft, unless the same has been recorded; and the record is not sufficient unless it designates the part of the animal upon which it is to be placed. But the statute controlling the subject can not be construed to mean that the record shall designate the particular right or left side, shoulder, flank or hip, as the case may be, of the animal upon which the brand is to be placed. It was sufficient in this case that the record of the brand showed that it was to be placed on the "hip, thigh and flank."

2. **Same—Fact Case—Practice in this Court.**—However conflicting may be the evidence adduced upon the trial, and however strong may be the exculpatory evidence produced by the defense, this court will not interfere with the finding of the jury, if there be sufficient legal evidence to support the verdict. See the statement of the case for evidence *held*, though conflicting, to be sufficient to support a conviction for cattle theft.

3. **Same—Continuance—New Trial.**—See the statement of the case for the substance of absent testimony set forth in an application for continuance, the materiality of which becoming apparent in the light of the evidence adduced upon the trial, entitled the accused to a new trial—the continuance having been refused.

Appeal from the District Court of Wilbarger. Tried below before the Hon. P. M. Stine.

This conviction was for the theft of a cow, the property of Tom Waggoner, in Wilbarger county, Texas, on the first day of April, 1886. The penalty assessed by the verdict was a term of two years in the penitentiary.

J. P. Turknett was the first witness for the State. He testified that he lived in Wilbarger county, Texas, and knew the defendant. On a certain Sunday, about April 1, 1886, the witness and his son-in-law, James Halston, left home for the purpose of going to and examining a certain farm. They took their guns with them, thinking it probable that they would see some turkeys. They got in pursuit of a flock of turkeys, on China creek, and came unexpectedly upon the defendant skinning a cow. Defendant said: "This is a good smash; have another." He then asked Halston to change guns with him for a few minutes. Halston did so,

and he stepped to a point a short distance from the dead cow and fired two shots—at least, witness heard two reports. He then returned and said: "I got the yearling. You must get down and have some." Witness then got down and cut off a piece of the beef, which he took home with him. On the next morning he went back to where he saw the defendant skinning the cow, and looked at the hide. He found that the hide, which was still there, was branded DD on the left side and D on the left hip. One of the side D's was on the hip and the other on the thigh. About two weeks after the witness caught the defendant skinning the cow, the defendant came to witness's house, and, in the presence of witness's family, asked witness and Halston if they were going to "give him away" about the three D cow. A day or two later, at the same place (witness's house), he said to witness that he would kill anybody who would give him away about the Waggoner cow. The cow was killed on China creek, about three miles distant from witness's house.

On his cross examination the witness said that his express purpose for going back to the place where the cow was killed, on the day after the killing, was to examine the hide and the brand in order to secure the indictment of the defendant. Witness did not see the brand on the yearling killed by the defendant. He and Halston did not leave home on the day alleged in the indictment for the purpose of killing a beef. A spotted dog followed witness and Halston from home on the day the beef was killed. They did not kill that dog because he kept chasing the cow and thus prevented him and Halston from getting a good shot at the cow. Halston killed the dog because he kept flushing and chasing the turkeys which they were pursuing. Seven or eight days after the witness surprised the defendant butchering the three D cow, a Mr. T. A. Williams and a Mr. Albert Hawkins came to the house in which witness was living, which house belonged to said Williams. At that time the witness had some beef on the roof of his shed, which beef the witness bought at Harrold. He bought that beef on the next day after he saw defendant skinning the three D cow. He bought it, for three cents per pound, of a butcher whose name he could not recall.

Mr. Banty testified, for the State, that some time in February, 1886, he went from his house to the house of the defendant. When he reached a point between eight and nine hundred yards distant from the defendant's house, he saw a beef had been re-

cently killed. The head and hide of the animal were still there. When he arrived at defendant's house he saw a bloody stick or hand spike lying in the yard. Beef was served by the defendant for dinner, but witness saw no beef on his place other than that he saw on the table. Witness accused the defendant of killing the beef of which he had just seen the head and hide, but defendant denied that he did so, and said that he would not do such a thing.

Mrs. James Halston testified, for the State, that she was the daughter of the State's witness Turknett, and the wife of the James Halston referred to by Turknett in his testimony. Some time in April, 1886, defendant came to Turknett's house, and while there, in the hearing of the witness, asked Turknett if he and James Halston were going to give him away about the three D cow. He came again soon afterward, and, in the hearing of the witness, said that he would kill any man who gave him away about the said three D cow. Witness thought that the attorney for the defense ought to know that her feelings for the defendant were unkind.

Mrs. Whittenberg testified, for the State, that in 1886 she lived in a house situated very near the house occupied by the State's witness Turknett; that she visited Turknett's family and that of James Halston very frequently, and was on most intimate terms with them. Some time in April, 1886, while witness was at the house of the said Turknett, the defendant came there and in her hearing asked Turknett and Halston if they were going to give him away on the three D cow; that same day, afterward, she was again at Turknett's house when defendant came there again, and, in the hearing of the witness, asked the same question of the State's witness Turknett, and said that if anybody gave him away about the three D cow he would kill him.

On her cross examination this witness said that defendant, on the occasion of his second visit to Turknett's house, remained there as long as two hours after he said he would kill any man who gave him away about killing the cow. Witness could not remember the hours of the day defendant spent at Turknett's house on the said last visit.

Tom Waggoner testified, for the State, that he was the son of D. Waggoner, and a member of the live stock firm of D. Waggoner & Son. That firm owned about fifty thousand head of cattle, which ranged in Wichita, Wilbarger, Baylor and Greer counties, Texas, and in the Indian Territory. Witness, during

the year 1886, had and exercised exclusive care, control and management of said cattle. He never gave his consent to the defendant to take or kill any of his cattle. The brand of D. Waggoner & Son was D on the right hip, D on the right thigh, and D on the right flank. Sometimes these brands, through mistake, were placed on the left hip, flank and thigh. No person other than D. Waggoner & Son ever gave the three D brand. If the cow described in the indictment was taken by defendant, it was taken without the witness's knowledge or consent.

On his cross examination the witness said that he did not know of his own knowledge that the defendant ever got any of his cattle. Witness only knew his cattle by the brand.

At this point the State introduced in evidence the record of marks and brands, which showed the record of DDD on the "hip, thigh and flank" as the cattle brand of D. Waggoner & Son.

The State closed.

Albert Hawkins was the first witness for the defense. He testified that, on or about January 29, or February 1, 1886, he went to the house of the defendant, reaching there between two and three o'clock in the evening. George Hawkins reached the defendant's house soon after the witness did. Soon after the said George Hawkins reached the defendant's house, the witness heard shooting from a northeasterly direction from defendant's house. About two hours before sun down Jesse Brown and Silas Cartwright came to the defendant's house in a hack in which they had some turkeys. They remained at defendant's house but a few minutes, going off in the direction whence the witness heard the shooting. Witness left defendant's house about sun down to go home. When he left he went in the direction whence he heard the shooting a few hours before. At a point in a drain, about seven hundred yards northeast from defendant's house, he found the entrails and hide of a cow which had been killed not exceeding two hours. The brand on that hide was D on the hip, D on the thigh and D on the flank. There were no entrails nor hide at that place when, between two and three o'clock, he passed it going to the defendant's house. Defendant was at his house during the whole of the witness's said visit. On either the seventh or eighth day of February, 1886, the witness and T. A. Williams went to the house in which J. P. Turknett and James Halston then lived, and witness then saw, on the roof of

Turknett's shed, about one hundred pounds of beef, cut into small pieces and spread out to dry.

George Hawkins testified, for the defense, that he went to the house of the defendant on Sunday, January 29, 1886, reaching there about three o'clock. He left defendant's house about three-quarters of an hour before sun down, going down China creek, and then over the surrounding hills, in search of his horse. Between sun down and dark he saw Turknett and Halston leading their horses, each with a quarter of beef secured to his saddle. While witness was at defendant's house he heard four or five reports of a gun fired from a northeast direction from defendant's house. Just before those shots were fired, Jesse Brown and Silas Cartwright, driving a hack, came up to defendant's house from the direction of Beaver creek, where they had been turkey hunting. Brown and Cartwright soon left defendant's house, going towards the point where witness heard the shooting. They had about had time to reach the place of the shooting when the witness heard the shots fired. Defendant was at home all of the time during witness's visit to him on the said day. En route to attend the court, the witness met the State's witness, Mrs. Whittenberg, and, in answer to her question, told her that the distance to his, witness's house, was seventeen miles. Mrs. Whittenberg on that occasion told witness that she knew nothing whatever about this case.

William Thompson, the son of the defendant, testified, for the defense, that about the last of January, 1886, he was herding sheep on the prairie, about a mile and a half northeast of defendant's house. While at that point he saw Turknett and James Halston, aided by a blue and white spotted dog, chasing a cow. Halston shot the dog and then shot and killed the cow. The cow killed by Halston was a "three D" cow. Witness was about one hundred yards from the cow when she was shot, and could and did see the brands plainly, each of which was about the size of a volume of Texas Reports. The said cow was killed about an hour before sun set. The day Mr. Banty visited defendant's house was the next day after the said cow was killed by Turknett and Halston, as stated. At that time there was at the defendant's house a stick between six and seven feet long, which had been used on the Thursday before in butchering sheep. They used that stick in taking the carcasses of the sheep to Harrold, and in bringing back about thirty-five pounds of beef which they bought from butcher Bunk.

Jesse Brown testified, for the defense, that he and Cartwright went turkey hunting on Beaver creek about the last of January or the first of February, 1886. They went by the defendant's house, where they 'found defendant and Albert and George Hawkins. From defendant's house, witness and Cartwright went to witness's house, passing a certain point between seven and eight hundred yards northeast of defendant's house, where they saw the State's witnesses, Turknett and James Halston, running and shooting at a cow. Turknett finally shot her down. Witness saw a herd of sheep grazing not far from where the cow fell. This occurrred about an hour or an hour and a half before sun set. Witness went on home without ascertaining whose cow it was that Turknett killed.

T. A. Williams testified, for the defense, that on or about February 1, 1886, he and Albert Hawkins went to the house occupied by Turknett, but which belonged to the witness, for the purpose of notifying Turknett to vacate the same. When he reached the premises the witness saw between one hundred and one hundred and fifty pounds of beef, cut into small pieces, spread out to dry on the roof of the shed. Witness was living in Harrold in January and February, 1886. Beef at that time was selling in Harrold at ten cents per pound retail, and five and six cents per pound wholesale. He never knew or heard of Turknett buying any beef in Harrold.

Defendant's motion for continuance set up that by his absent witness William Gultroy, he would be able to prove that the prosecuting witness J. P. Turknett shot and killed the cow described in the indictment, in the presence and view of said Gultroy, and that defendant was in no way connected with the killing of said cow. By his absent witness Ben Blackburn, he expected to prove that the certain stick seen by one or more of the State's witnesses on defendant's premises, subsequent to the killing of the cow, was made bloody by being used by the defendant in butchering certain sheep.

*R. T. Sitterly* and *L. C. Barrett*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for theft of cattle. Two grounds are relied upon in the brief of counsel for a reversal of the judgment. Tom Waggoner is alleged to be the owner of

the cow. No witness knew the animal to be the property of Waggoner except by the brand. To show title in Waggoner, the State introduced in evidence the record of the cattle brand of Waggoner. The brand was recorded on the twenty-third day of November, 1886. It is objected that the record fails to designate the part of the animal upon which the brand is to be placed. If this be so, then the record of the brand is not admissible. (Penal Code, art. 783; Harwell v. The State, 22 Texas Ct. App., 251.)

The objection of appellant is that the record fails to show upon which side of the animal the brand is to be placed. This is so, but is this required by the statute? Article 783 (supra) provides that if "any clerk of the county court shall record any brand when the person having the same recorded fails to designate the part of the animal upon which the same is to be placed, shall be fined not less than ten nor more than fifty dollars." Unless the part of the animal upon which the brand is to be placed is designated, the brand should not be recorded at all, and hence it could be evidence of nothing though it should be recorded—the act of recording such a brand by the clerk being an offense against the laws of this State. But is this brand record obnoxious to the objection urged?

From the record the brand appears to be three Ds—one to be placed upon the hip, one upon the thigh, and one upon the flank of the animal—the side not being designated.

Question: Is it necessary to designate the side of the animal, whether the right or the left, upon which the brand is to be placed, in order to comply with section 20 of the act of April 8, 1874? We are of the opinion that it is not, and that the designation of the part of the animal upon which the brand is to be placed, to wit, on the "hip, thigh and flank," contained in the record, is sufficient.

The second ground relied on for reversal of the judgment is that the evidence is not only insufficient, but that the verdict is against the weight of the evidence—that the innocence of defendant was clearly established.

There is a serious conflict in the testimony. Turknett, evidently an accomplice, swears to facts which, if true, are unquestionably sufficient to sustain the verdict. But, being an accomplice, he must be corroborated to warrant a conviction. Was he corroborated? If the two women are worthy of credit, he was most clearly corroborated. Then, stripping the case of the

evidence for the defendant, there can be no question as to the sufficiency of the evidence to support the verdict, if the witnesses are worthy of belief.

On the other hand, if the witnesses who testified for the defendant are truthful, there can be no doubt of the innocence of the appellant, nor can there be less doubt of the guilt of the State's witness, Turknett. The case, is, therefore, one of conflict of evidence, with a greater number of witnesses-swearing for defendant, and testifying to facts which, if true, demonstrate his innocence. But, as there is sufficient evidence—evidence cogent and certain—clearly showing appellant's guilt, if true, and as the jury are the judges of the credibility of the witnesses, we cannot disturb their verdict, though from this record we might have reached a different conclusion from that arrived at by the jury.

Though the point is not presented in the brief of counsel, it is assigned as error that the court below erred in first refusing a continuance on the ground of absent testimony, and in afterwards refusing to grant a new trial. We have very carefully considered this assignment, in connection with the evidence in the statement of facts, and, while some of the desired evidence is cumulative, we are of the opinion that other facts to be established by the testimony were not of this character, and were very material for the defense. It was the first application, and due diligence having been used and shown, the new trial should have been granted. For this error the judgment is reversed and the cause remanded.

*Reversed and remanded.*